SIDLEY AUSTIN LLP
Thomas R. Califano (10369867)
Andres Barajas (*pro hac vice* application pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

Duston McFaul (24003309)
Charles M. Persons (24060413)
Maegan Quejada (24105999)
Jeri Leigh Miller (24102176)
Juliana L. Hoffman (24106103)
2021 McKinney Ave
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GVS TEXAS HOLDINGS I, LLC, and GVS PORTFOLIO I C, LLC, *et al.* [1] | Case Nos. 21-31119-MVL through 21-31164-SGJ |
| Debtors. | **(Joint Administration Requested)** |

**DECLARATION OF ROBERT D. ALBERGOTTI IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: GVS Texas Holdings I, LLC (7458); GVS Texas Holdings II, LLC (1225); GVS Portfolio I, LLC (6441); GVS Portfolio I B, LLC (7171); GVS Portfolio I C, LLC (3093); WC Mississippi Storage Portfolio I, LLC (0423); GVS Nevada Holdings I, LLC (4849); GVS Ohio Holdings I, LLC (6449); GVS Missouri Holdings I, LLC (5452); GVS New York Holdings I, LLC (5858); GVS Indiana Holdings I, LLC (3929); GVS Tennessee Holdings I, LLC (5909); GVS Ohio Holdings II, LLC (2376); GVS Illinois Holdings I, LLC (9944); and GVS Colorado Holdings I, LLC (0408). The location of the Debtors' service address is: 814 Lavaca Street, Austin, Texas 78701.

I, Robert D. Albergotti, being duly sworn, state the following under penalty of perjury:

1. I am an independent director on the board of directors (the "Board") of GVS Portfolio I C, LLC and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). I have over forty years of experience in the development and implementation of complex restructuring solutions through internal reorganizations, asset dispositions, divisional shutdowns, and Chapter 11 restructurings.

2. Prior to joining the Debtors' Board as an independent director, I practiced law in the Restructuring Group at the firm of Haynes and Boone, LLP for 38 years. I focused primarily on representing companies that were undergoing or considering restructuring, but also obtained significant experience representing creditors, lenders, equity security holders, and distressed asset buyers. During my time at Haynes and Boone, LLP, I represented clients in a broad range of industries. Notable engagements include serving as lead debtor counsel for American Healthcare Management, Inc. bankruptcy in 1987-1989; representing bondholders in the National Benevolent Association of the Christian Church (Disciples of Christ) bankruptcy in 2004; and acting as lead debtor counsel in a number of middle-market retail and energy cases, as well as high-profile aviation cases. In addition, I was retained by the California State Assembly to advise on the California Electricity Crisis in 2001. Following my retirement in 2018, I was awarded the Lifetime Achievement Award from the Bankruptcy Section of the Texas Bar. I have been a fellow to the American College of Bankruptcy since the 1990s.

3. I joined Haynes and Boone, LLP in 1980 after working at a small firm in North Carolina for four years. I hold a B.A., *cum laude*, from the University of South Carolina, and a

M.A. and J.D. from Tulane University. At Tulane, I was Editor in Chief of the Tulane Law Review. I was awarded Order of the Coif and the Deans Award for graduating first in my class.

4.    I have become generally familiar with the Debtors' day-to-day operations and business and financial affairs. Except as otherwise indicated herein, all statements set forth in this declaration (the "Declaration") are based on (a) my review of relevant documents and information provided to me by advisors to the Debtors; and (b) my opinion based on my review of the Debtors' operations and financial and business affairs, including my general knowledge of the industry in which the Debtors operate. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I would testify competently to the facts set forth herein.

5.    On June 17, 2021 (the "Subsidiaries Petition Date") the Debtors, with the exception of GVS Portfolio I C, LLC, filed these cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court"). On June 23, 2021, (the "Parent Petition Date" and, together with the Subsidiaries Petition Date, the "Petition Date"), GVS Portfolio I C, LLC filed a petition for voluntary relief under chapter 11 of the Bankruptcy Code in the Court in order to, along with the other Debtors, preserve and maximize the value of the Debtors' assets for the benefit of their stakeholders and the estates.

6.    The Debtors operate as real estate holding companies as is described in greater detail herein (the "GVS Portfolio"). As such, they did not require immediate consideration of the typical panoply of emergency first day motions; however, the Debtors are requesting various forms of relief pursuant to certain "first day" motions and applications (collectively, the "First Day

3

Pleadings").[2]  The relief requested in the First Day Pleadings is intended to allow the Debtors to meet their obligations as debtors in possession.  The Debtors are requesting, among other things, that the Court: (a) approve the Debtors' use of cash collateral, which will provide the liquidity necessary for the Debtors to continue to operate their business during the chapter 11 cases; (b) authorize the Debtors to continue paying in full certain prepetition claims in the ordinary course of business, including prepetition tax and utilities claims; (c) authorize the Debtors to continue using their existing lockbox and cash management, and operating bank accounts and funding for employees of Great Value Storage, LLC; and (d) authorize the implementation of certain administrative procedures to minimize any disruption to the Debtors' business as a result of the commencement of the chapter 11 cases.

7.      I submit this Declaration to provide an overview of the Debtors and their business, and to provide information in support of the Debtors' chapter 11 petitions and the First Day Pleadings.  I am familiar with the contents of each the First Day Pleadings and I believe that the relief requested in each First Day Pleading: (a) is necessary to preserve and maximize the value of the Debtors' estates; (b) is essential to the successful reorganization of the Debtors; and (c) serves the best interests of the Debtors' estates, creditors, and other parties in interest.

### Preliminary Statement

8.      The property portfolio owned by the Debtors was assembled over a 10-year period by the Debtors' sponsor.  The property portfolio amounts to one of the largest self-storage facility operations in the nation.  The Debtors have more than 64 facilities around the country, including six in the DFW Metroplex.

---

[2] A full list of First Day Pleadings are included in Part IV of this Declaration.  Unless otherwise defined herein, capitalized terms in this Declaration shall have the meanings ascribed to them in the respective First Day Pleading.

9.       The GVS Portfolio is competitive with other self-storage brands and historically performed at above-market levels.  Nevertheless, the Debtors were forced into bankruptcy to preserve their enterprise value and protect against a foreclosure process which would have neither preserved nor maximized value for estate stakeholders.

10.       Because of unanticipated developments (described more fully in paragraphs 31-34, below), a series of defaults occurred that culminated in a foreclosure attempt by the Mezzanine 2 Lender (as hereafter defined), leading to the filing of the GVS I B Case.  After the GVS I B Case was dismissed as a "two-party dispute" between GVS Portfolio I B, LLC and RREF III Storage LLC ("RREF"), material circumstances changed, including a series of additional defaults at each level of debt (thereby implicating interests of each of the Debtors) and the scheduling of a second foreclosure sale.

11.       Part I of this Declaration summarizes the Debtors' history and operations.  Part II describes the Debtors' capital structure.  Part III discusses the events and circumstances leading to the commencement of these chapter 11 cases, including the action pending in New York Court (as hereafter defined) and the GVS I B Case (as hereafter defined).  Part IV sets forth the relevant facts in support of each of the First Day Pleadings.

**PART I**
**Company History and Operations**

**A.       Overview of Operations**

12.       The Debtors are limited liability companies with the principal business of owning a wide array of properties functioning principally as self-storage and parking facilities.  The Debtors are controlled by their Board of Directors, which consists of myself as an independent director, Richard Arthur, an independent director, Colleen De Vries, an independent director, and Mr. Natin Paul, principal shareholder of the Debtors' ultimate corporate parent.  The storage

5

facilities are managed pursuant to certain property management agreements with Great Value Storage, whose principal shareholder is also Mr. Paul. Although the Debtors do not directly employ the on-site property managers, the Debtors are responsible for the payment of all operational expenses, including employee wage costs for property managers, maintenance and repair costs, and/or other capital expenditure expenses that are necessary to manage the business and otherwise operate the facilities for the purpose of renting storage to consumers. The Debtors have approximately 64 storage locations in Texas, Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, and Tennessee.

13. Each of the Debtors are directly or indirectly owned by GVS Portfolio I, LLC, GVS Portfolio I B, LLC, and GVS Portfolio I C, LLC. The Debtors' current organizational chart is set forth more fully in Part II.A., below.

14. Since their formation, the Debtors and their non-Debtor operating affiliates have generated revenue and marketed their services as "Great Value Storage,"[3] and maintain approximately 30,811 units, totaling 4,103,764 square feet. The storage units offer secure storage with 24-hour security systems, both climate controlled and non-climate controlled; RV, car, and boat parking; moving and storage supplies; and moving truck rentals. In addition to conventional storage units, the GVS Portfolio includes 1,380 covered and uncovered vehicle parking units; thirteen office, warehouse and retail commercial spaces; four campsites; seven billboards; and two cell tower leases.

15. The Debtors directly or indirectly own the real property where the storage facilities are located and are responsible for the payment of all operational expenses, including, but not limited to, certain repair and maintenance, property insurance, and tax obligations. However, a

---

[3] www.greatvaluestorage.com.

6

non-Debtor affiliate, Great Value Storage, LLC, is responsible for the leasing and management of the storage facilities. The Debtors generate revenue through the regular and periodic collection of rents from the thousands of tenants who lease storage space at the properties.

### B. The Debtors' Board of Directors

16.     Prior to the Petition Date, the Debtors board consisted of Natin Paul, who held three seats, and independent directors Richard Arthur and Colleen De Vries. Mr. Arthur and Ms. De Vries were appointed as part of the Debtors' financing structure at the direction of the Debtors' initial lenders.

17.     As the need for the filings became more imminent, I was approached to serve as independent director with primary oversight responsibility for the Debtors' restructuring efforts. Accordingly, I was appointed to the Board for the Debtors on June 16, 2021 and June 23, 2021.[4] The Debtors' Board now consists of myself, Mr. Paul, Mr. Arthur, and Ms. De Vries.

18.     My appointment as an independent director was to facilitate the filing and independent supervision of these cases. As lead independent director, I have been granted primary responsibility for the restructuring process. I began familiarizing myself with the Debtors' business operations and capital structure immediately upon my appointment. I reviewed key documents, including but not limited to, prior valuations, the Debtors' organizational documents and cash management agreements, and relevant loan documents and default notices with respect to each level of debt. Based upon this preliminary review, I supported the filing of these chapter

---

[4] On June 16, 2021, I was appointed to the Board of GVS Texas Holdings I, LLC; GVS Texas Holdings II, LLC; GVS Portfolio I, LLC; GVS Portfolio I B, LLC; WC Mississippi Storage Portfolio I, LLC; GVS Nevada Holdings I, LLC; GVS Ohio Holdings I, LLC; GVS Missouri Holdings I, LLC; GVS New York Holdings I, LLC; GVS Indiana Holdings I, LLC; GVS Tennessee Holdings I, LLC; GVS Ohio Holdings II, LLC; GVS Illinois Holdings I, LLC; and GVS Colorado Holdings I, LLC. On June 23, 2021, I was appointed to the Board for GVS Portfolio I C, LLC.

11 cases to preserve existing value and to provide a forum that would facilitate a productive restructuring.

19. In my capacity as an independent director, I intend to work with the Debtors' team of professionals to evaluate various strategic alternatives for reinstating, refinancing and/or restructuring their existing debt and potentially pursue a competitive marketing process if we determine a sale is in the best interest of these estates. In addition, I will work with the Debtors' investment bankers, Houlihan Lokey, Inc. ("Houlihan") to secure access to needed capital, develop a business plan for a swift emergence, and provide general support with respect to the Debtors' restructuring efforts. The full terms of my engagement are attached hereto as **Exhibit A**.

### C. The Debtors' Investment Bankers

20. On June 12, 2021, the Debtors engaged Houlihan to provide investment banking services in preparation for the filing of these cases and through the pendency of the bankruptcy.[5] The Board's goal is to work with Houlihan to formulate, evaluate and implement a reinstatement, recapitalization or restructuring of the Debtors existing debt obligations and other liabilities to establish a sustainable long-term capital structure suitable to the Debtors' operations.

### PART II
### Capital Structure

21. The following is an approximate overview of the Debtors' consolidated capital structure as of the Petition Date:

---

[5] The *Debtors' Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) to Retain and Employ Houlihan Lokey, Inc. as Investment Banker to the Debtors Effective as of the Petition Date* is forthcoming and will be filed at a later date.

| Description | Amount ($mm) | Interest Rate | Maturity |
|---|---|---|---|
| Senior CMBS | $110.0 | 4.140% | Dec. 2023 |
| Mezzanine 1 | $103.0 | 5.500% | Dec. 2023 |
| Mezzanine 2 | $115.2 | 8.715% | Dec. 2023 |
| **Total Secured Debt**[6] | **$328.2** | | |

## A. The Loan Facilities

22.     On or about November 30, 2018, the original lender, UBS AG ("UBS") made three loans related to the GVS Portfolio, including a $110 million mortgage facility at the property-entity level serviced by the Servicer (as defined below) (the "Mortgage Loan"), a $103 million mezzanine loan (the "Mezz 1 Loan") to GVS Portfolio I, LLC ("GVS") now held by ESS-GV Holdings LLC (an affiliate of Extra Space Storage, a competitor of the Debtors), and the consolidated mezzanine facility of $82 million in principal to GVS Portfolio I B, LLC (the "Mezz 2 Loan" and, collectively with the Mortgage Loan and Mezz 1 Loan, the "Loans"), which is now held by RREF. A depiction of the Debtors' capital structure, as evidenced in the organization chart, is as follows:

---

[6] The amounts set forth herein represent estimates of amounts claimed by the Lenders as of the Petition Date and are subject to the Debtors' internal verification. The Debtors reserve all rights to amend, supplement, modify and/or dispute such estimates at a later date.



1. *Mortgage Loan*

23. UBS originated the Mortgage Loan in the amount of $110 million to twelve of the Debtors[7] (collectively, the "Mortgage Borrowers"), which was evidenced by those certain promissory notes dated November 30, 2018, including Note A-1-1, Note A-1-2, Note A-3, Note A-4, Note A-5, and Note-6, as they may have been amended, restated, and/or replaced (collectively the "Notes"). The Mortgage Loan is secured by a first-priority mortgage and security interest in all real and personal property then owned or thereafter acquired, including but not limited, to the real property owned by each of the Mortgage Borrowers; bank accounts and deposit accounts; and the rents received in connection with the operation of the Mortgage Borrowers' business (collectively, the "Collateral"). In addition, as part of the Mortgage Loan, the Mortgage Borrowers collaterally assigned to UBS those certain property management agreements by and

_____

[7] The Mortgage Borrowers as defined herein consist of GVS Texas Holdings I, LLC; WC Mississippi Storage Portfolio I, LLC; GVS Nevada Holdings I, LLC; GVS Ohio Holdings I, LLC; GVS Missouri Holdings I, LLC; GVS New York Holdings I, LLC; GVS Indiana Holdings I, LLC; GVS Tennessee Holdings I, LLC; GVS Texas Holdings II, LLC; GVS Ohio Holdings II, LLC; GVS Illinois Holdings I, LLC; and GVS Colorado Holdings I, LLC.

10

between each Mortgage Borrower and Great Value Storage, LLC (individually and/or collectively as the context requires, the "Property Management Agreement"), which provide for the management and day-to-day operation of the Mortgage Borrowers' businesses at each of the real property locations. UBS perfected its security interest in the Collateral through filings with the applicable local and state registries and/or control. The Notes are currently held by Wells Fargo Bank, National Association ("Wells Fargo"), as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15 Commercial Mortgage Pass-Through Certificates, Series 2018- C15 and Wilmington Trust, National Association, as Trustee, for the benefit of Wells Fargo Commercial Mortgage Trust 2019-C50 Commercial Mortgage Pass-Through Certificates, Series 2019-C50 (the "Mortgage Loan Lender"). Midland Loan Services, a division of PNC Bank, National Association, services the Mortgage Loan on behalf of the Mortgage Loan Lender (the "Servicer").[8] As of the Petition Date, approximately $110 million in principal remains outstanding.

> 2.   *Mezz 1 Loan*

24.     UBS originated the Mezz 1 Loan in the amount of $103 million to GVS Portfolio I, LLC (the "Mezz 1 Borrower"), which owns 100% of the membership interests in the Mortgage Borrowers. The Mezz 1 Loan is secured by Mezz 1 Borrower's interests in the Mortgage Borrowers and is currently held by ESS-GV Holdings LLC (the "Mezz 1 Lender," and together with the Mortgage Loan Lender, the "Senior Lenders"). As of the Petition Date, approximately $103 million in principal remained outstanding on the Mezz 1 Loan.

---

[8] At the time this cash management system was implemented, the mortgage servicer was Wells Fargo, but subsequently switched to Midland in January, 2020.

25.     The Mortgage Borrower and Mezz 1 Borrower executed pledge agreements and promissory notes in respect of their interests in property.

> 3.     *Mezz 2 Loan*

26.     UBS originated the initial Mezz 2 Loan in the amount of $63 million to GVS Portfolio I B, LLC (the "Mezz 2 Borrower"), the repayment of which is secured by its membership interests in the Mezz 1 Borrower and is evidenced by that certain Mezzanine 2 Loan Agreement dated as of November 30, 2018 (the "Mezz 2 Loan Agreement").  UBS subsequently assigned the Mezz 2 Loan to Teachers Insurance Annuity Association of America ("TIAA"), which executed that certain Omnibus Amendment to the Mezz 2 Loan Agreement, dated January 7, 2019, increasing the principal amount of the Mezz 2 Loan by $19 million.  As further explained below, RREF is the current holder of the Mezz 2 Loan.  According to the Debtors' books and records, there was approximately $82 million in principal outstanding under the Mezz 2 Loan as of the Petition Date.

27.     In addition, the Mortgage Loan Lender, Mezz 1 Lender and Mezz 2 Lender are all parties to that certain intercreditor agreement (the "ICA") dated as of November 30, 2018.  Among other things, the ICA places certain restrictions on the transfers of the Mezz 1 and Mezz 2 Loans, meaning they cannot sell their interests absent certain notices or consents, in addition to other compliance.

**B.     Debt Service through the Cash Management Waterfall Distribution**

28.     At the time the Loans were originated, UBS implemented a cash management structure whereby the rents and other payments owed to the Mortgage Borrowers are deposited into a lockbox account in the name of GVS Texas Holdings I, LLC, which is under the control of the Servicer.  Since approximately December 2019, each month, on the Monthly Payment Date

(which is typically the 6th of each month), the Servicer applies available funds in the Lockbox Account to pay the interest, fees, and expenses on its facility, reserves for escrows, other expenses including the Debtors' operating expenses, and if there are no intervening defaults, remits funds to the Mezz 1 Lender and then to the Mezz 2 Lender for each of their respective loan payments. If there are no intervening defaults, the cash management bank. In the event excess cash remains following all of the payments above, such cash is swept into a subaccount (the "Excess Cash Subaccount"), also controlled by the Servicer. The Servicer effectively controls the funds, and a late payment under a senior loan can initiate a default on the junior debt if payment is not properly remitted from the lockbox.

## PART III
## Events Leading to the Chapter 11 Cases

### A. The New York State Court Action

29.     GVS Portfolio I B, LLC initiated an action against TIAA, as Mezz 2 Lender, in the New York State Supreme Court (the "NY Court") on August 27, 2020,[9] which sought to enjoin TIAA from pursuing the foreclosure sale. The NY Court initially granted the motion and enjoined TIAA from foreclosing, finding the sale to be commercially unreasonable. The NY Court ordered the parties to meet and confer as to the terms of the foreclosure auction, which resulted in the entry of a stipulation (the "Stipulation")[10] memorializing the terms of the sale.

30.     It is my understanding that, two days prior to the rescheduled foreclosure auction, TIAA sold the Mezz 2 Loan to RREF without notice to the Mezz 2 Borrower. Based on information gleaned from the Debtors and prior pleadings, the Debtors obtained a temporary

---

[9] *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020 (N.Y. Sup. Ct. Oct. 5, 2020).

[10] *See GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020, NY Sup. Ct. D.I. 1112 (N.Y. Sup. Ct. Oct. 5, 2020) (Stipulation Regarding Terms of UCC Sale, Notice of UCC Sale and Confidentiality Agreement).

restraining order, arguing the sale to RREF violated the terms of the Stipulation and did not provide adequate notice as required under the Mezz 2 Loan documents. The Debtors' were unsuccessful in their attempts to enjoin this sale after the expiration of the initial temporary restraining order.

### B. The Delaware Bankruptcy

31. On April 12, 2021, GVS Portfolio I B, LLC filed for bankruptcy (the "GVS I B Case")[11] in the District of Delaware Bankruptcy Court (the "Delaware Court"). Shortly thereafter, RREF commenced an action in the NY Court against the Mezz 2 guarantor, Natin Paul, seeking payment in full of the outstanding principal due under the Mezz 2 Loan.[12] GVS Portfolio I B, LLC was the sole debtor in the GVS I B Case, making RREF the only secured creditor. I was informed that the subsidiaries of GVS Portfolio I B, LLC – each of which is a Debtor in these chapter 11 cases – were not debtors in the GVS I B Case because, at the time, the senior lenders had not declared a default such that the affiliates were facing impact on their cash flows or the threat of full cash sweep by the senior Mortgage Lender.

32. On April 26, 2021, RREF filed a motion seeking dismissal of the GVS I B Case, arguing the GVS Portfolio Case was not filed in good faith and seeking a lift stay.[13] On the issue of good faith, it is my understanding that RREF argued that the dispute was two-party dispute. The Court then elected to bifurcate RREF's relief sought and only hear its "good faith" arguments at a threshold matter.

33. Based on my review of the pleadings, hearing transcript and Judge Sontchi's decision on the issue of dismissal for lack of good faith, the case was dismissed upon the Delaware

---

[11] *In re GVS Holdings I B, LLC,* Case No. 21-10690 (Sontchi).

[12] *See RREF III Storage LLC v. Natin Paul*, Index No. 0652558/2021 (N.Y. Sup. Ct. Apr. 16, 2021.

[13] GVS Portfolio Case [ECF No. 8].

Court's finding that, from an objective perspective, the conflict between the GVS Portfolio I B, LLC debtor and RREF was essentially a two-party dispute: GVS Portfolio I B, LLC – *as the sole debtor* – had a single asset, only one secured creditor, and no cash or income beyond the cash management waterfall. The Delaware Court deflected a deeper analysis and deferred to the New York Court's denial of the injunction, but expressed skepticism about RREF's aggressive behavior.[14] The GVS Portfolio Case was dismissed on June 4, 2021.[15] A copy of Judge Sontchi's memorandum opinion is attached hereto as **Exhibit B**.

### C. The Current Bankruptcy

1. *Material Change In Circumstances Since the GVS Portfolio I B, LLC Case*

34. On or around May 6, 2021, the Mortgage Loan Lender issued a notice of default requesting confirmation of certain reporting and property repairs that were required under the Mortgage Loan. The Mortgage Borrowers promptly responded to the notice and initiated discussions with the Mortgage Loan Lender to remedy the issues. Despite these conversations, the Mortgage Loan Lender issued another letter on June 4, 2021 detailing certain liens and other property-level items that needed to be cleared. The Mortgage Loan Lender immediately withheld all of the cash revenues in the Lockbox preventing payment to the Mezz 1 Lender, thereby triggering a default under the Mezz 1 Loan.

35. The Mezz 1 Lender issued a default notice for missing the monthly payment due to the Mortgage Loan Lender's withholding, and the Mezz 1 Borrowers immediately began efforts to remedy the defaults.

---

[14] GVS Portfolio Case [ECF No. 86] (Memorandum Order Granting Motion to Dismiss Case) ("What also causes pause is RREF's aggressive behavior in calling defaults over one late (and cured) payment, but again, that is something for the New York state court to consider.").

[15] *Id.*

36.     RREF then re-noticed its foreclosure sale to be held on June 17th at 9:00 a.m. Central Time.  Only days before the rescheduled sale, RREF increased its payoff demand by approximately $14,150,303.86.  Facing the defaults at the senior level, senior mezzanine level RREF's increased demand, and RREF's UCC foreclosure sale, there became the need to protect the estates for all Debtors.

37.     Given the Debtors' capital structure: the cash trap at the senior level affecting the Mezz 1 Loan, the unresolvable issues with the Mezz 2 Lender and imminent foreclosure, and the inability to efficiently restructure out of court in light of the intercreditor and related approvals, I believe that filing these chapter 11 cases was necessary to preserve the value of the entire GVS Portfolio—which I understand to be over $450 million based on preliminary valuations[16]—and effectuate a holistic restructuring across the entire debt stack.

2.     *Debtors' Need For Chapter 11 Relief*

38.     As explained herein, the Debtors' circumstances have changed materially since the filing of the GVS I B Case, namely: (i) the Mortgage Loan Lender *and* the Mezz 1 Lender (although subsequently cured) had each declared defaults under their respective loan documents, trapping all of the Debtors' cash and (ii) RREF re-noticed its UCC foreclosure sale of the Mezzanine Borrower's interests, which would result in a substantial loss of equity in the Debtors' overall portfolio.

39.     Considering these circumstances, and guided by our goals of preserving value and protecting the Debtors and their respective storage facilities until the disruption of the business from the pandemic can be remedied, the Debtors have filed these chapter 11 cases to restructure

---

[16] The Debtors have three appraisals that were conducted prepetition by CBRE Group, Inc., Eastdil Secured and Newmark Knight Frank, but are currently working with myself and their advisors to provide an updated valuation.

the Debtors' business around three core objectives: (i) obtaining the time to determine whether a refinance of the capital structure or a sale of the underlying properties best preserves value for all stakeholders; (ii) exploring strategic alternatives to maximize the Debtors' value on a go-forward basis; and (iii) preserving the equity value above the debt to turn the Debtors toward profitability upon emergence.

40.    Based on conversations with Houlihan Lokey, I believe there is substantial value in these Debtors that can only be recognized through a comprehensive restructuring of the Debtors' funded debt obligations through the chapter 11 process.

3.    *Cash Collateral Negotiations*

41.    The Debtors have been working diligently with the Servicer to reach a consensual agreement as to the terms of an interim order authorizing the Debtors to use cash collateral. As of the date herein, the parties have negotiated the terms of an Interim Order that is acceptable to the parties and is intended to preserve value and maintain the status quo until longer term financing arrangements can be made. No other parties have an interest in or right to the Cash Collateral under the various loan documents.

**PART IV**
**Relevant Facts in Support of First Day Pleadings**

42.    The Debtors have filed several First Day Pleadings, consisting of administrative motions and motions relating to the Debtors' transition into chapter 11. The Debtors' advisors believe, and I agree, that the approval of each First Day Pleading is an important element of the Debtors' reorganization efforts. I have reviewed each of the First Day Pleadings, including the exhibits thereto, or had their contents explained to me by the Debtors' personnel and advisors, including the exhibits thereto. With respect to the First Day Pleadings set forth below, I believe that the Debtors would suffer immediate and irreparable harm absent the ability to obtain the relief

requested in such First Day Pleading. Factual information with respect to each First Day Pleading is provided below and in each First Day Pleading. Capitalized terms, to the extent not defined in this Part IV, shall have the meanings ascribed to such terms in the respective First Day Pleadings.

**A.    Administrative Motions**

1.    *Amended Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases (the "*Joint Administration Motion*")*[17]

43.    Through the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of these chapter 11 cases for procedural purposes. Because the Debtors' financial affairs and business operations are closely related, many of the motions, hearings, and orders in the bankruptcy proceedings will affect all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections without harming the substantive rights of any party in interest.

44.    Joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, because it will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders. Accordingly, I respectfully ask the Court to grant the relief requested in the Joint Administration Motion.

2.    *Amended Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (II) Authorizing the Debtors to Redact Certain Personal Identification Information of Directors (the "*Consolidated Creditor List Motion*")*[18]

45.    Through the Consolidated Creditor List Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file the Consolidated Creditor Matrix and the Consolidated Top 30

---

[17] ECF No. 13.

[18] ECF No. 15.

Creditors List; and (ii) authorizing the Debtors to redact certain personal identification information of employees and directors. Because segregating and converting their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor will help alleviate administrative burdens, costs, and the possibility of duplicative service. I also believe that redaction of the personal information of the Debtors' current and former directors is necessary to protect such information from identity theft or other misuse.

46.     Accordingly, I respectfully ask the Court to grant the relief requested in the Consolidated Creditor List Motion.

3.     *Amended Emergency Motion for Order Extending the Time to File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs (the "Schedules and Statements Extension Motion")*[19]

47.     Through the Schedules and Statements Extension Motion, the Debtors seek entry of an order extending the deadline by which the debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 20 days, for a total of 34 days from the Petition Date.

48.     I submit that good and sufficient cause for granting an extension of time to file the Schedules and Statements exists. To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' assets and contracts. This information is voluminous and collecting the necessary

---

[19] ECF No. 16.

information requires an significant expenditure of time and effort on the part of the Debtors and their professional advisors in the near term, when these resources would be best used to focus on negotiating the potential refinancing discussed herein and facilitating the transition of the Debtors into chapter 11.

49.     Although the Debtors have commenced the process that will enable them to prepare and finalize the Schedules and Statements, the Debtors anticipate that they may require at least 20 additional days to complete the Schedules and Statements. The Debtors therefore request that the Court extend the 14-day period for an additional 20 days for cause shown. Accordingly, I respectfully ask the Court to approve the Schedules and Statements Extension Motion.

>    4.     *Emergency Application of Debtors Pursuant to 28 U.S.C. §156(c), 11 U.S.C. §§ 105(a), 327, and 503(b), Fed. R. Bankr. P. 2002(f), 2014(a), and 2016, and Local Rule 2014-1 for Appointment of Omni Agent Solutions as Claims, Noticing, and Solicitation Agent* Nunc Pro Tunc *to the Petition Date (the "Claims Agent Application")*[20]

50.     Through the Claims Agent Application, the Debtors seek entry of an order appointing Omni Agent Solutions ("Omni") as claims, noticing, and solicitation agent ("Claims Agent") in the Debtors' chapter 11 cases, effective *nunc pro tunc* to the Petition Date.

51.     I believe that the Debtors' selection of Omni to act as Claims Agent is appropriate under the circumstances and is in the best interest of the estates. The terms of Omni's retention were negotiated at arm's length, and Omni was chosen after six engagement proposals were considered by the Debtors and their advisors. Omni's rates are competitive and comparable to the rates charged by their competitors for similar services.

52.     The Debtors anticipate that there will be hundreds of persons and entities to be noticed and that many of these parties will file claims. In view of the number of anticipated

---

[20] ECF No. 18.

claimants and the complexity of the Debtors' business, they respectfully submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk of the administrative burden of, noticing and soliciting and tabulating votes, and is in the best interests of both the Debtors' estates and creditors. Accordingly, I respectfully ask the Court to approve the Claims Agent Application.

**B. Motions Relating to Business Operations for First Day Relief**

1. *Emergency Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral and Granting Related Relief (the "Cash Collateral Motion")*[21]

53. Pursuant to the Cash Collateral Motion, the Debtors request (i) approval to use Cash Collateral in accordance with the Budget, subject to the Budget Variance; (ii) approval to provide adequate protection in the form of: (a) an additional and replacement security interest in and lien on l property and assets of the Mortgage Borrowers' estates now or hereinafter acquired and all proceeds thereof (the "Adequate Protection Liens"); (b) as provided for in the Budget, a monthly payment to the Mortgage Lender of an amount equal to the monthly, non-default interest charge; (c) as provided in the Budget, amounts necessary to reimburse Mortgage Lender for the fees, costs, and charges due and owing pursuant to the Mortgage Loan that were paid during the month preceding the Monthly Payment Date (as defined below); provided that Mortgage Lender submits invoices to the Debtors, the Committee, and the U.S. Trustee within the time period set forth in the Interim Order for the same; (d) a Superpriority Claim; and (e) accrual of default interest during the Interim Period, in a reserve account held by the Senior Lender (subparts (a) through (e) above, collectively, the "Adequate Protection"); and (iii) relief from or modification of the automatic stay

---

[21] ECF No. 19.

imposed to the extent necessary to implement and effectuate the relief requested in the Cash Collateral Motion.

54.     The Debtors urgently need to use the Cash Collateral for both the ongoing operation of their business and to fund the administration of these chapter 11 cases.  The Debtors are responsible for the payment of all operational expenses, including, but not limited to, employee wages, taxes, insurance, vendors or other general unsecured creditors creditor costs, repair costs, and other capital expenditure costs, and failure to pay these obligations could affect the ability of the operational company to continue doing business.  Importantly, the Debtors' next Monthly Payment Date is due July 6, 2021.

55.     Thus, absent authority to use Cash Collateral the Debtors could be forced to undertake drastic measures, such as shuttering operations, which would result in the loss of virtually all of the Debtors' rental income and the imposition of certain statutory and tax liens on the real property assets, both of which would cause irreparable harm to the Debtors' estates.  I believe that all of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern and ensure the Debtors' uninterrupted operations throughout their chapter 11 cases.

56.     For the reasons set forth herein and in the Cash Collateral Motion, I believe that access to the use of Cash Collateral is in the best interests of the Debtors' estates and all stakeholders, is fair and appropriate under the circumstances, and therefore should be approved.

2.   *Emergency Motion of Debtors for Entry of Order (I) Authorizing Use of Cash Management System; (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers; (III) Authorizing Continuation of Intercompany Transactions; (IV) Waiving Requirements of Section 345 of the Bankruptcy Code; and (V) Granting Related Relief (the "Cash Management Motion")*[22]

57.   Through the Cash Management Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to (a) use the streamlined cash management system (the "Cash Management System"), including existing bank accounts, and (b) honor certain prepetition obligations related thereto; (ii) authorizing applicable banks and other financial institutions to honor and process related checks and transfers; (iii) authorizing the Debtors to continue, in the ordinary course of business, transactions between and among the Debtors (the "Intercompany Transactions"); (iv) waiving requirements of section 345 of the Bankruptcy Code; and (v) granting related relief, including scheduling a final hearing.

58.   The Debtors maintain a centralized Cash Management System that they use in the ordinary course of business to collect funds generated by their operations and disburse those funds to satisfy obligations required to operate their business. The Cash Management System allows the Debtors to fund certain escrow accounts and expenses, including the tax, insurance, and capital expenditure escrow accounts, operating expenses, and the debt service for the Mortgage Loan.

59.   Use of the streamlined Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative expenses and inefficiencies associated with disrupting this system and minimizing delays in the payment of postpetition obligations. On behalf of the Debtors, I respectfully submit that, because the Debtors use appropriate mechanisms to ensure that unauthorized payments will not be made on account of

---

[22] ECF No. 22.

prepetition obligations, maintaining the Cash Management System, including the Bank Accounts, will not harm parties in interest.

60. I believe that requiring the Debtors to implement changes to the Cash Management System at this critical stage of these cases would be expensive, impose needless administrative burdens on the Debtors, disrupt the Debtors' operations, and affect the Debtors' ability to maximize value.

> 3. *Emergency Motion of the Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To Pay Certain Prepetition Taxes and (II) Granting Related Relief (the "Tax Motion")*[23]

61. Through the Tax Motion, the Debtors seek a final order (i) authorizing, but not directing, the Debtors, in their discretion, to pay (or use tax credits to offset) the Taxes, (ii) authorizing financial institutions to honor and process related checks and transfers, and (iii) granting related relief.

62. In the ordinary course of business, the Debtors collect, withhold, and incur various types of taxes and fees as described in the Tax Motion. The Debtors remit the Taxes to various federal, state, and local government entities. The Debtors must continue to pay the Taxes to avoid potential costly distractions during these chapter 11 cases. Specifically, the Debtors' failure to pay the Taxes could adversely affect the Debtors' estates because the governmental authorities could file liens, seek to lift the automatic stay, or seek to impose penalties on the Debtors' directors or officers, thereby diverting their attention from the administration of the Debtors' chapter 11 cases.

63. I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

---

[23] ECF No. 21.

continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully ask the Court to grant the relief requested in the Tax Motion.

4. *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 366 and 105(a) For Entry of a Final Order (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service; (II) Determining Adequate Assurance of Payment for Future Utility Services; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief (the "Utilities Motion")*[24]

64. Through the Utilities Motion, the Debtors seek a final order (i) prohibiting the Debtors' utility providers (the "Utility Providers") from altering, refusing, or discontinuing service to the Debtors, except as set forth in the Utilities Motion; (ii) determining adequate assurance of payment for future utility services; (iii) establishing procedures for determining adequate assurance of payment to the Utility Providers; and (iv) granting related relief.

65. In the ordinary course of business, the Debtors incur utility expenses, including electricity, natural gas, water, and telecommunications (including internet and cable). The Debtors make utility payments by direct payment to a Utility Provider providing such services.

66. The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner and anticipate having sufficient funds to do so. Nevertheless, to provide the Utility Providers with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose depositing into a segregated account at Wells Fargo for the benefit of the Utility Providers (the "Adequate Assurance Account"), cash in an amount equal to two weeks of the Debtors' average cost of utility services for a one-month period, less any deposits or letters of credit already held by Utility Providers (the "Adequate Assurance Deposit"). Based on this

---

[24] ECF No. 17.

formula, the Debtors estimate that the total amount of the Adequate Assurance Deposit should equal $37,500.

67.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures. These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient. This ensures that all key stakeholder groups obtain notice of such request before it is honored.

68.     Furthermore, the Debtors request that Utility Providers be prohibited from refusing or disrupting Utility Services, for any duration. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations. The Debtors' storage facilities offices for the management teams are serviced by Utility Providers.  Any interruption in utility services—even for a brief period of time—would disrupt the Debtors' ability to continue their business operations and would irreparably impact the going concern value of the enterprise.  Such a result would adversely affect the Debtors' restructuring efforts.  I believe it is critical that the Debtors obtain the relief requested herein to ensure they are able to maintain and pay for utility services on an uninterrupted basis throughout these chapter 11 cases.  Accordingly, I respectfully ask the Court to grant the relief requested in the Utilities Motion.

5.  *Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b), and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Authority to (I) Continue Insurance Policies and Pay All Obligations with Respect Thereof, and (II) Granting Related Relief (the "Insurance Motion")*[25]

69.     Through the Insurance Motion, the Debtors seek interim and final orders (i) authorizing the Debtors to continue their Insurance Policies, (ii) authorizing the payment of all prepetition obligations related thereto, and (iii) granting related relief.

70.     Continuation of the current Insurance Policies and entry into new insurance policies are essential to the operation of the Debtors' business and is necessary to protect the Debtors from catastrophic, potential liability.  Furthermore, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee's requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

71.     As of the Petition Date, no amounts are due and outstanding on account of the Insurance Policies and the Debtors' Insurance Policies' premiums have been paid in full, in advance.  Nevertheless, the Debtors are requesting authority to maintain the Insurance Policies and pay their Insurance Premiums as they come due in the ordinary course of business.

72.     In addition, in the ordinary course of business, the Debtors utilize the services of an insurance broker (the "Broker") to assist the Debtors with the procurement and negotiation of many of the Debtors' Insurance Policies.  The Broker is essential to the Debtors' ability to secure insurance coverage, as the Broker obtains and manages their Insurance Policies in a reasonable and prudent manner and enables the Debtors to realize considerable savings in the procurement of the Insurance Policies.  The Debtors seek authority to continue to utilize the Broker's services in

---

[25] ECF No. 20.

the ordinary course of business and pay any Broker fees in connection with the procurement of the Insurance Policies.

73. Based on the above, I respectfully ask the Court to grant the relief requested in the Insurance Motion.

[*Remainder of Page Intentionally Left Blank*]

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 29th day of June, 2021

/s/ Robert D. Albergotti
Robert D. Albergotti
Director
GVS Portfolio I C, LLC